**STATE of Missouri, Respondent,**

v.

**James Burl JOHNSON, Appellant.**

**No. 56967.**

Supreme Court of Missouri, Division No. 1.

Sept. 11, 1972.

Motion for Rehearing and to Transfer to Court En Banc Denied Oct. 9, 1972.

John C. Danforth, Atty. Gen., Neil Mac-Farlane, Asst. Atty. Gen., Jefferson City, for respondent.

Keith Brown, Russell & Brown, Nevada, Mo., Court Appointed, for appellant.

WELBORN, Commissioner.

On April 13, 1953, an information was filed in the Barton County Circuit Court charging James Burl Johnson with forcible rape. The case was tried in Vernon County on a change of venue and on June 17, 1953, a jury returned a verdict finding the defendant guilty and assessing the punishment at 30 years' imprisonment. On appeal, this court reversed the judgment of conviction and the case was remanded for a new trial. State v. Johnson, 267 S.W.2d 642. Upon remand, a jury, on November 18, 1954, found the defendant guilty and fixed the punishment at 40 years' imprisonment. On November 19, 1954, the defendant appeared with his attorney, waived his right of appeal, and was sentenced in accordance with the verdict to 40 years' imprisonment.

As a result of a motion under Supreme Court Rule 27.26, V.A.M.R., the Vernon County Circuit Court found that Johnson had been unconstitutionally deprived of his right of appeal. The order of the circuit court was affirmed by this court. Johnson v. State, 458 S.W.2d 713, decided September 14, 1970. The case was remanded to permit the filing of a motion for new trial and for further proceedings upon the disposition of such motion.

A motion for new trial was filed by counsel appointed to represent the defendant. The motion for new trial was argued on behalf of defendant and on May 26, 1971, the motion was overruled. Allocution was granted and the defendant sentenced to 40 years' imprisonment in accordance with the verdict. The court allowed the defendant credit for jail and prison time served since his first conviction on June 17, 1953. This appeal followed.

The state's evidence showed that, on the evening of January 10, 1953, appellant Johnson was a spectator in a bowling alley in Lamar at which four young women were bowling. The four left the bowling alley together at around 11:30 P.M. They were in an automobile of one of the wom-

en on the parking lot of the bowling alley when defendant, carrying a pistol, accosted them, forced his way into the automobile and ordered the driver to drive to a little-traveled road in the vicinity. Johnson ordered the driver to stop the car and, after threatening the women with the gun, had sexual intercourse with three of them. He directed the driver to return to Lamar and at around 2:45 A.M. she did so and Johnson got out after threatening the women if they reported the incident.

Johnson was apprehended in Oklahoma. On February 10, 1953, the four women involved viewed Johnson in the office of the district attorney in Jay, Oklahoma, and identified him. He was returned to Barton County and charged with three separate offenses of forcible rape. Trial was on one of such charges.

On this appeal, numerous grounds have been advanced for reversal of the conviction.

I

During the second day of the trial, at the conclusion of the testimony of the third of the four women involved, the following occurred:

"MR. COMBS [Special Prosecutor]: I resent the remarks of this defendant.

"DEFT. JOHNSON: That's my personal opinion.

"MR. COMBS: That's all right, but I don't have to set here and be humiliated before this jury, Your Honor.

"THE COURT: That's right.

"DEFT. JOHNSON: When I was over there—

"MR. COMBS: He called me a son-of-a-bitch.

"DEFT. JOHNSON: I did not call him a son-of-a-bitch.

"MR. COMBS: I don't have to take this, Your Honor, from him or anybody else.

"DEPT. JOHNSON: I didn't call you a son-of-a-bitch.

"MR. COMBS: I heard what you said.

"DEFT. JOHNSON: I said you were a rotten bastard.

"MR. COMBS: You said I was a son-of-a-bitch.

"THE COURT: Just a minute. This is no laughing matter. I want you to conduct yourself different, altogether different. The Court doesn't have to set up here and put up with that neither.

"MR. COMBS: I don't have to take it across this table either.

"DEFT. JOHNSON: Look, Judge.

"THE COURT: Wait a minute. Carrol Combs is a gentleman and you've got no right to sit there and call him a son-of-a bitch or anybody else. The Court won't stand for that at all.

"MR. COMBS: I didn't.

"THE COURT: Now proceed and you conduct yourself different. The Court doesn't have to set up here and let you go on either.

"DEFT. JOHNSON: I didn't say that.

"THE COURT: Proceed, gentlemen."

Later in the day, Johnson undertook to cross-examine a state's medical witness by use of the transcript of his testimony at the first trial. At the conclusion of the witness's testimony, the following occurred:

"MR. COMBS: If Your Honor please, I've taken just about all I can from this defendant. He is still making remarks to me, calling me a blubber boy and blubber-ass and everything else across the counsel table and I'm not going to take it any more.

"MR. JOHNSON: I haven't said anything to you. I just messed up your testimony a little bit. I didn't do it, it is in the book.

"THE COURT: Mr. Johnson, I don't want you calling anybody names.

"MR. JOHNSON: I haven't said 'phooey' to the man.

"THE COURT: From here on, behave."

■ Appellant's objection here is that these colloquies occurred in the presence of the jury. He contends that the trial court erred in not taking steps to purge the prejudicial effect in the eyes of the jury of the remarks of the special prosecutor. Appellant equates the situation with that in which corrective action by the trial court was required to avoid prejudicial error because the prosecutor applied unbecoming names to the defendant. State v. Burnett, Mo.Sup., 429 S.W.2d 239, 245–246[9], [10, 11]; State v. Stroud, 362 Mo. 124, 240 S.W.2d 111, 113[9, 10]. The situation presented by those cases is distinguishable on two grounds. First, the prosecutor applied unbecoming names to the defendant, whereas here the prosecutor was reporting to the court the names which the defendant had applied to him. Second, the trial court in those cases was requested to take remedial action and did so. Here, no remedial action was requested and the trial court did not err in failing to act of its own motion. State v. Williams, Mo.Sup., 419 S.W.2d 49, 53[6]; State v. Bland, Mo.Sup., 353 S.W.2d 584, 587[7].

## II

The denial of right to effective assistance of counsel is asserted on the basis that trial counsel failed to object to appellant's being tried as a second offender and failed to object to testimony by the women, other than the complaining witness, of the details of the assaults by defendant upon them.

■ The question presented by appellant's being tried as a second offender on the second trial is more fully considered below. On the issue here presented, under Missouri law as it stood at the time of the second trial in 1954, the second trial was a new trial on all issues and the verdict at the first trial which was silent on the second offender charge was not res judicata on that issue. State v. Chamineak, Mo. Sup., 343 S.W.2d 153, 162–163[18, 19]. Defense counsel is not now to be faulted for failing to have foreseen later United States Supreme Court decisions now claimed to have a bearing on this issue.

■ Failure to object to the testimony concerning the assault by appellant upon the women other than the prosecutrix in the case on trial does not evidence inadequacy of representation amounting to deprivation of right of counsel. Part of appellant's defense was that he was incapable of committing four acts of intercourse. Trial counsel may have felt that permitting the entire occurrence to go before the jury would add credence to the defense. In any event, the testimony of the other women was so interrelated with the assault on the one that an objection would not have precluded its admission. See State v. Wilson, Mo.Sup., 320 S.W.2d 525; State v. Swinburne, Mo.Sup., 324 S.W.2d 746, 753[9].

## III

The information under which appellant was tried both times charged that he had four prior felony convictions. At the first trial, objection to evidence of two of the convictions was made on the grounds of failure of the record offered to show that the defendant had been discharged from the sentence. § 556.280, RSMo 1949, in effect at that time. When such objection was made, the prosecution withdrew the evidence of those two convictions. The case was submitted to the jury under a verdict form authorizing a finding that defendant had been duly convicted of and discharged on the other two felony convictions charged in the information. The jury made no finding on the habitual criminal charge.

At the second trial, the record of discharge from the two sentences not submitted at the first trial had been obtained and

the records of all four convictions were submitted and the jury found those four prior convictions.

Appellant here contends that, under the 1970 decision of the United Supreme Court in Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300, the court had no jurisdiction to try him on the second trial under the Second Offender Act because the silence of the jury on that issue on the first trial amounted to a finding that defendant was not a second offender, precluding his subsequent trial as a second offender. Appellant also invokes the rule of collateral estoppel applied in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, and Simpson v. Florida, 403 U.S. 384, 91 S.Ct. 1801, 29 L.Ed.2d 549.

■ "The habitual criminal act goes only to the punishment, not the guilt or innocence of an accused of the offense on trial, * * *." State v. O'Brien, Mo. Sup., 252 S.W.2d 357, 360[4, 5]. "* * * [T]he Double Jeopardy Clause of the Fifth Amendment is written in terms of potential or risk of trial and conviction, *not punishment.*" (Emphasis supplied) Price v. Georgia, 398 U.S. 323, 329, 90 S. Ct. 1757, 1761, 26 L.Ed.2d 300. "The Double Jeopardy Clause, as we have noted, is cast in terms of the risk or hazard of trial and conviction, not of the ultimate legal consequences of the verdict." Id. 398 U. S. 331, 90 S.Ct. 1762. Given such meaning of the Double Jeopardy Clause and the nature of the Second Offender Act, the Double Jeopardy Clause is not here applicable.

■ Collateral estoppel involves the determination of an issue of ultimate fact by a valid and final judgment. Ashe v. Swenson, supra. There was no final judgment in the first trial as to the two prior convictions withdrawn and not submitted to the jury. Therefore, the doctrine of collateral estoppel would not have precluded their use on the second trial. Assuming the applicability of the doctrine as to the two which were resubmitted, their use here was harmless error in view of the failure

of the jury to impose the maximum penalty of life imprisonment called for by the finding of prior convictions. Gerberding v. Swenson, 8th Cir., 435 F.2d 368, cert. den. 403 U.S. 906, 91 S.Ct. 2211, 29 L.Ed.2d 682.

IV

■ Appellant contends that he was not mentally competent to stand trial and assist counsel in the presentation of his defense. A physician who had been on the staff of the State Hospital in Nevada testified that he examined appellant before the first and second trials and concluded that he had "a very definite mental disease." He was not positive that it was dementia praecox. "[I]t could be in the group which we classify as psychopathic personality with a schizoid or paranoid type of reaction." The physician's testimony was directed primarily to the then applicable test of knowledge of right from wrong. He expressed no opinion concerning the defendant's competency to stand trial or to cooperate with counsel.

Defendant testified in his own behalf. He engaged in a lengthy discourse devoted largely to his prior convictions and a commitment for mental illness in Minnesota in 1943. Neither counsel nor the court made any serious effort to control and direct the defendant's testimony, with the result that it is rambling and disconnected, but it does not show that the defendant was not competent to stand trial or to assist in his own defense.

On this record, there has been no showing that appellant is entitled to relief on this ground.

V

■ Appellant contends that, under North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656, his constitutional rights have been violated because he received a 40-year sentence on his second trial, after having been sentenced to only 30 years' imprisonment on his first trial.

This court has held that North Carolina v. Pearce does not apply when the second sentence is imposed by a jury. Spidle v. State, Mo.Sup., 446 S.W.2d 793, 795[2]; Kansas City v. Henderson, Mo.Sup., 468 S.W.2d 48, 52–53[2, 3].

Federal courts are not in accord on this question. Chaffin v. Stynchcombe, 5th Cir., 455 F.2d 640, and Britt v. Tollett, U.S.D.C., E.D.Tenn., 315 F.Supp. 401, hold as does this court on the issue. Levine v. Peyton, 4th Cir., 444 F.2d 525, cert. den. Slayton v. Levine, 404 U.S. 995, 92 S.Ct. 536, 30 L.Ed.2d 547, and Pinkard v. Neil, U.S.D.C., M.D.Tenn., 311 F.Supp. 711, are to the contrary. The United States Supreme Court, in North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413, did not reach the merits of the question presented in Kansas City v. Henderson, supra.

Absent definitive holding by controlling federal authority, the prior holdings of this court are adhered to on this question.

### VI

█ Appellant contends that the trial court erred in admitting the records of his prior convictions. The objection to admissibility on grounds of inapplicability of the Habitual Criminal Act is disposed of in part above. Appellant also objects that the records were not properly authenticated. He has not pointed out wherein the authentication is deficient and has presented nothing for review on this ground.

### VII

█ The objection to the instruction on the Habitual Criminal Act is adequately covered by what is said above with reference to the applicability of the Habitual Criminal Act. Objection is made that the instruction so told the jury that if the victim submitted to the defendant because of fear, "the jury should find the defendant guilty as charged in the information * * *." Appellant contends that this in effect directed a finding of guilt on the

Habitual Criminal Act, which was, of course, charged in the information. Taking the instructions as a whole, there is no question that the jury was adequately and fully informed as to the necessity of an explicit finding on the applicability of the Habitual Criminal Act. Instruction No. 2 enumerated the findings required on that issue and the form of verdict used by the jury did likewise. The contention is without merit.

█ Instruction No. 4 was a burden of proof instruction which included the following language:

"* * * although you may believe and find that the defendant did commit the rape alleged, yet if, from the evidence, you further find that at the time he did it he was in such an insane condition of mind that he did not know he was doing wrong, *and did not comprehend the nature and character of the act,* then such act was not, in law or in fact, malicious or felonious, and you ought to acquit him on the grounds of insanity, and by your verdict so say."

Appellant contends that the italicized portion of the instruction requires the jury to find not only that the defendant knew right from wrong, the then applicable test, but also to find that he did not comprehend the nature and character of the act charged.

Instruction No. 8 set forth the findings required to support the defense of insanity. Numerous cases have approved the language of Instruction No. 4, used in connection with the language of Instruction No. 8. See State v. Schaefer, 116 Mo. 96, 22 S.W. 447; State v. Barbata, 336 Mo. 362, 80 S.W.2d 865, 869–873. The language objected to is nothing more than a repetitious manner of saying that the defendant did not know right from wrong. This is made clear by the language of Instruction No. 8, requiring that the jury find the defendant incapable of distinguishing right from wrong "and incapable of understanding that the particular act in question was a

violation of the law of God and of society." The language of the charge taken as a whole was not erroneous.

### VIII

■ Objection is made to the trial court's refusal to admit in evidence six pencil drawings made by appellant. Appellant argues that the drawings were relevant on the insanity issue. The drawings have not been presented here, so there is no basis for a finding that the trial court's ruling was error.

■ Objection is also made to the trial court's refusal to require one of the victims to lie on an automobile seat produced at the trial and demonstrate how she was able while the appellant was having intercourse with her to reach his gun lying on the floor and remove three bullets from it. The witness had testified that she did so. The trial court sustained the prosecution's objection to the request, remarking, "I'm not going to humiliate this young lady by having her lie down there."

The trial court's ruling was not an abuse of its discretion in controlling the presentation of demonstrative evidence. 22A C. J.S. Criminal Law § 708, p. 944.

### IX

■ In his closing argument, defense counsel made the following statement:

"Now this man has a record of being found insane. The doctor gets on the stand, an experienced doctor, and tells you that this man is abnormal and is of unsound mind. The court tells you in the Instructions that if you find that this man is of unsound mind that you should so state in your verdict and under the Instructions of the court immediately if this jury finds that this man was of unsound mind and is now of unsound mind this court immediately has to commit him to one of the state institutions in the State of Missouri and that's the end of it."

In his rebuttal, the prosecutor said:

"Now Mr. Teel says: 'Let's put him in an institution.' 'Let's put him in an insane asylum and that's the end of it.' Those are Mr. Teel's words 'That's the end of it.'

"Gentlemen, let's see what happened. This man was incarcerated in the State of Minnesota in the County of Ramsey on July 7, 1943. State's Exhibit 17 shows that at the September Term 1944 in the District Court of the State of Iowa, Buchanan County, there was an order and judgment made where this man came in and represented himself, he was opposed by the County Attorney and Robert L. Larson, Assistant Attorney General. He was committed by that court and in a few months he was released, gentlemen, after he was incarcerated—would that be the end of it?

"MR. JOHNSON: I was not.

"MR. COMBS: Would that be the end of it if you put him away in an insane asylum—no, sir.

"MR. TEEL: Just a minute, if the Court please, I object to that, to those last remarks as being highly prejudicial and I ask that this jury be discharged. This is the same thing as we had before.

"THE COURT: That will be overruled. Proceed.

"MR. COMBS: That was Mr. Teel's own statement, gentlemen of the jury. I am answering his statement at this time that that would be the end of the case."

Appellant contends that the prosecutor's argument and the trial court's ruling on his objection present the same situation found in the first trial when the conviction was reversed on the grounds that the prosecutor's final argument improperly disparaged the defense of insanity. State v. Johnson, 267 S.W.2d 642.

The argument here is not the same as that in the first trial which this court concluded amounted to telling the jury that if the defendant were found not guilty by

reason of insanity, he would be "soon discharged to rape again." 267 S.W.2d 645. The language of defense counsel's argument opened the door to the retaliatory argument here made. The prosecutor stopped far short of the argument he made at the first trial and did not go beyond the bounds of proper retaliation.

## X

The girls saw Johnson in custody at Jay, Oklahoma, on February 10, 1953. Johnson was seated at a table with the Barton County prosecutor. Each of the girls viewed him separately and identified him at that time. Three of them so testified at the trial. Appellant now contends that the view of defendant by the victims at Jay and their subsequent identification testimony violated his constitutional rights. Appellant also invokes Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, on the grounds that the victims were shown a single photograph and that the person pictured was the defendant.

■ This is, of course, a pre-United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, situation. The totality of circumstances test applies. Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Simmons v. United States, supra. The most significant fact here is the independent source of the witness's identification, they having seen appellant in the lighted bowling alley and he having been in the auto with them for more than two hours. Any claim of constitutionally impermissible lineup or photographic identification procedures is clearly harmless error, Gilbert v. California, supra, particularly since identification was not really an issue in view of the plea of insanity.

## XI

■ Appellant contends that the court committed plain error in requiring him to "Speak loud enough so everybody can hear" in presenting a request for a lie detector test and in objecting to the deputy who had custody of the jury. Appellant contends that these matters should have been heard outside the presence of the jury and that by requiring him to speak loud enough for the jury to hear, the trial court required him to air matters that were highly prejudicial to the appellant in the eyes of the jury. Appellant does not explain how the request for a lie detector test might have prejudiced him in the eyes of the jury. Obviously such a request is intended to bolster a claim of innocence. The question of the custody of the jury involved a lengthy statement by Johnson in which he accused the deputy sheriff of plotting to kill him. There was no request to take the matter up outside the presence of the jury and in the course of his presentation, Johnson said, "I want to be sure enough people hear this, I'm kinda wound up here this morning, I know quite a bit." The trial court's refusal in these circumstances to require, of its own motion, that the matter be heard outside the presence of the jury was not error.

■ Appellant also contends that the trial court was committed to a course of discrediting the appellant in the eyes of the jury. In addition to the two items above, he calls attention to an exchange between the court and the defendant when the drawings by defendant were offered in evidence and excluded by the court. The court had sustained the objection and Johnson was attempting to argue the matter further and the court stated: "There is nothing to connect them with this case that is on trial here at all." Johnson: "There is no writing on that. Maybe you might learn something on that." The Court: "I am learning something right now. *That is a great picture.* The objection will be sustained, gentlemen. That has no connection with this case." (Emphasis supplied)

Appellant argues that the italicized remarks of the judge tended to show to the

jury that the judge felt that the defendant was guilty.

"It is hardly necessary to say again here that the court must always maintain an absolute impartiality in any trial, both in its remarks and in its conduct generally; it should not do or say anything which might prejudice the jury or be construed by the jury as indicating a belief in defendant's guilt or innocence." State v. Sanders, Mo.Sup., 360 S.W.2d 722, 726[6, 7]. The remark here was not such as " 'would tend reasonably to influence the minds of the jury against the defendant, consequently denying him the right to a fair and impartial trial.' " State v. Brotherton, Mo.Sup., 266 S.W.2d 712, 717.

## XII

When the last day of the trial opened, after the jury had entered the courtroom and defense counsel had announced his objections to the instructions, the following occurred:

"MR. TEEL: I ask that all these witnesses being paraded in here in front of the jury, except the prosecuting witness, be confined to the back of the courtroom in the spectators' section and not brought in here to sit in front of the jury as Exhibit A, B, C and D. I object to their presence in the courtroom.

"MR. BOYER: I would like to have the record show that there are probably fifteen or twenty people within the enclosure.

"MR. TEEL: Clear the enclosure then. I certainly am objecting to these girls being paraded in front of the jury. There are plenty of seats back in the courtroom.

"THE COURT: The girls are not parading in front of the jury. They are in the courtroom with the other people.

"MR. TEEL: They are not even sitting in the courtroom in the place reserved for the public.

"THE COURT: They are setting in the room where the lawyers are and there are others here too. I won't require them to be removed anyhow.

"MR. TEEL: I'm not asking that they be removed from the courtroom, Your Honor. I'm asking that they be requested to set where the rest of the ordinary spectators set.

"THE COURT: That will be overruled, but the Court will not permit them to be paraded before the jury or nothing like that.

"MR. BOYER: I'd like to have the record show that they came in quietly and sat at the far end of the room in some vacant seats.

"MR. TEEL: I'd like to have the record show they are setting down immediately in front of the jury box and not setting in the seats reserved for spectators in the courtroom.

"THE COURT: Let the record show that they are setting—the jury is on the east side of the courtroom and the girls are setting on the west side of the courtroom. The courtroom is probably thirty feet wide.

"MR. TEEL: I ask at this time, if these witnesses are permitted to set in the place where they are now setting, that it is prejudicial and that this jury be discharged by reason thereof.

"THE COURT: The objection will be overruled. Sheriff, bring the defendant in here."

During the prosecutor's closing argument, the following occurred:

"(Whereupon counsel proceed to the bench where the following proceedings were had:

"MR. TEEL: Again at this time I object to the presence of part of the witnesses setting in a portion of the courtroom not open to the spectators, displaying

emotion and crying in front of the jury. I ask that the jury be discharged.

"MR. BOYER: I don't observe any of them crying.

"THE COURT: The objection will be overruled. They are clear across the courtroom, thirty feet away, proceed."

Appellant now contends that permitting the women to sit in the "fenced in" portion of the courtroom where the lawyers sit, and their display of emotion during the closing argument was highly prejudicial and that the trial court's refusal of remedial action was reversible error.

Appellant's argument assumes that the persons involved included the three women in the automobile other than the prosecutrix in the case on trial. The record does not identify the persons other than as "witnesses." Whether all of the witnesses were present does not appear.

In any event, this was a matter for the trial court's exercise of discretion in controlling the proceeding in his courtroom. State v. Pinkston, Mo.Sup., 333 S.W.2d 63; State v. Elbert, Mo.Sup., 471 S.W.2d 170, 173[3, 4]. The trial court's determination that the persons involved should be allowed to sit along with other spectators in an area ordinarily reserved for attorneys at a distance from the jury box, when they were not, as the trial court observed, "paraded" before the jury, was not an abuse of discretion.

As for the objection to the "witnesses" "displaying emotion and crying in front of the jury" the trial court's ruling again was a matter for his exercise of discretion. To have called attention to the persons at that time by requiring them to leave would merely have magnified the matter. The statement of counsel that the persons were "displaying emotion and crying" is not self-proving. The prosecuting attorney disagreed with the observation. The trial court, in a position to see what occurred, concluded that the drastic remedy of a mistrial was not required. His ruling will not be disregarded.

The situation is not comparable with that involved in the case of State v. Connor, Mo.Sup., 252 S.W. 713, where the prosecutor called attention to the weeping parents of the murder victim. The occurrence was described as a "stage performance" more befitting "a theater than a court of justice. The perfervid appeals of counsel and dramatic allusions to the bereaved and grief-stricken parents evinced a studied purpose to inflame the prejudice and passions of the jury against the defendant." 252 S.W. 722. No such appeal was made by the prosecutor here and that case is not controlling.

XIII

Appellant finally contends that the verdict was the result of bias and prejudice on the part of the jury. This argument is based upon a lumping together of the matters involved in the testimony of the other rape victims (II above), the requirement by the court that appellant speak loudly when making objection (XI), the reception of evidence of his prior convictions (II and III), alleged improper argument disparaging the defense of insanity (IX) and the prosecutor's reporting in the hearing of the jury that appellant called him obscene names (I).

These matters have all been considered separately and none has been found to have been reversible error. Their combination does not demonstrate that the verdict was the result of passion and prejudice.

Judgment affirmed.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.